# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO.: 1:24-cv-992

| | |
|---|---|
| C.G., along with parents, Valerie Grimm and Eric Grimm )<br><br>PLAINTIFFS, )<br><br>v. )<br><br>GUILFORD COUNTY BOARD OF EDUCATION )<br><br>DEFENDANT. ) | **COMPLAINT** |

## PRELIMINARY STATEMENT

1. V.G. and E.G. file this complaint against Defendant for discriminatory conduct against Plaintiffs based on C.G.'s disability in an education program receiving federal funds, in violation of Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act (ADA), the Fourteenth Amendment, and violations of State Law.

2. Defendants, by and through persons acting under color of state law, deprived Plaintiffs of their federal constitutional right to equal protection of the laws in violation of 42 U.S.C. § 1983.

1

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

4. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

5. This is an action arising under the laws of the United States and an action by Plaintiffs, who are aggrieved by the actions and inactions of Defendant.

6. This Court has supplemental jurisdiction over North Carolina state law claims pursuant to 28 U.S.C. § 1367.

7. Plaintiffs bring this action to redress deprivation of Plaintiffs' right to equal protection under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant Board is located within the Middle District of North Carolina, and a

2

substantial part of the acts or omissions giving rise to this complaint arose from events occurring within this judicial district.

9. This Court has the authority to enter a declaratory judgment and to provide permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202; and 20 U.S.C. § 1682.

## APPLICABLE LAW AND POLICY

10. Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits public entities, including local educational agencies (LEAs), from "exclud[ing] from the participation in, [ ] den[ying] the benefits of, or [ ] subject[ing] to discrimination" any otherwise qualified person with a disability from any program or activity receiving federal financial assistance solely by reason of her or his disability. 29 U.S.C. § 794(a).

11. Section 504 applies to each recipient of federal financial assistance from the Department of Education and to the program or activity that receives such assistance. 34 C.F.R. § 104.2. Defendant Board is a recipient to whom Section 504 applies. 34 C.F.R. § 104.3(f).

12. Section 504 requires "a recipient that operates a public elementary or secondary education program or activity . . . provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). An "appropriate education" is defined as "the provision of regular or special education and related aids and services that are (i) designed to meet individual educational needs

3

of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b) (emphasis added).

13. Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

14. The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws" or "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

## <u>PARTIES TO THE COMPLAINT</u>

15. PLAINTIFF C.G. is a thirteen (13) year old child. C.G. currently lives in, and at all times relevant hereto, has been a resident of the County of Guilford, State of North Carolina.

16. PLAINTIFFS Valerie Grimm (V.G.) and Eric Grimm (E.G.) are C.G.'s mother and father, respectively. Plaintiffs V.G. and E.G. currently live in, and at all relevant times hereto have been residents of the County of Guilford, State of North Carolina.

4

17. Plaintiff C.G., represented by his guardians and parents, V.G. and E.G., and V.G. and E.G., individually bring this action on behalf of Plaintiff C.G.

18. DEFENDANT GUILFORD COUNTY SCHOOLS BOARD OF EDUCATION ("GCS") is a Local Educational Agency (LEA) as that phrase is defined by 20 U.S.C. § 7801(30) (2015). As a local governmental unit, GCS is a "person" as defined by 42 U.S.C. § 1983 (2000). Defendant Board is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

## PROCEDURAL HISTORY

19. Principal Francisco initiated an investigation against C.G. on or about September 18, 2024.

20. Principal Francisco suspended C.G. for ten (10) days and made the recommendation for C.G.'s long term suspension for the remainder of the school year on September 20, 2024.

21. As C.G. is a student with a disability as defined by federal law GCS convened a manifestation determination review ("MDR") meeting on September 26, 2024.

22. During this MDR meeting, GCS determined the alleged conduct in

question was not a manifestation of C.G.'s disability.

23. Plaintiffs appealed Principal Francisco's recommendation for long term suspension to a GCS hearing panel. The hearing took place on October 07, 2024.

24. The GCS hearing panel denied Plaintiffs' appeal on October 8, 2024.

25. Plaintiffs timely appealed the GCS hearing panel's decision to the GCS Board. The Board hearing occurred on October 22, 2024.

26. The GCS Board was represented by three (3) members during the appeal.

27. The GCS Board denied Plaintiffs' appeal and continued C.G.'s removal from his base middle school, NGMS.

28. The GCS Board modified Principal Francisco's long term suspension to allow C.G., a student with a disability, to attend the alternative middle school ("SCALE") for the remainder of the semester.

29. Pursuant to Section 150B-43 of the North Carolina General Statutes, Plaintiffs have exhausted all administrative remedies made available to them by statute or agency rule and are entitled to judicial review of this decision.

30. Pursuant to N.C. Gen. Stat. § 150B-45, this petition is filed within thirty (30) days of Plaintiffs receiving a written copy of the Board's final

6

decision issued on October 23, 2024.

31. Any decision rendered by a local board of education under Section 115C-45(c)(1), (2), or (4) "may be further appealed to the superior court of the State on the grounds that the local board's decision is in violation of constitutional provisions, is in excess of the statutory authority or jurisdiction of the board, is made upon unlawful procedure, is affected by other error of law, is unsupported by substantial evidence in view of the entire record as submitted, or is arbitrary or capricious." N.C. Gen. Stat. § 115C-45(c).

32. The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are: (1) in violation of constitutional provisions; (2) in excess of the statutory authority or jurisdiction of the agency or administrative law judge; (3) made upon unlawful procedure; (4) affected by other error of law; (5) unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or (6) arbitrary, capricious, or an abuse of discretion. N.C. Gen. Stat. § 150B-

51(b).

33. A de novo standard of review applies to asserted errors under subsections (1) through (4) of Section 150B-51(b), while a whole record standard of review governs errors under subsections (5) and (6). N.C. Gen. Stat. § 150B-51(c).

34. The whole record standard of review requires the reviewing court to examine all competent evidence and determine whether the board's decision is supported by "substantial evidence." *Lackey v. N. Carolina Dep't of Human Res., Div. of Med. Assistance*, 306 N.C. 231, 293 (1982)(*citing Comr. of Insurance v. Fire Insurance Rating Bureau*, 292 N.C. 70, 80 (1977)). "Substantial evidence is any relevant evidence which is reasonably adequate to support a conclusion." *Id*.

35. Plaintiffs filed a due process action in North Carolina's Office of Administrative Hearings ("OAH") on November 8, 2024 challenging the determination reached at the MDR meeting.

36. As of the filing of this action, Plaintiff's due process action is pending before OAH on an expedited track.

## FACTUAL ALLEGATIONS

37. C.G. is not the first student with a disability GCS has discriminated against. GCS has historically discriminated against students with

disabilities. The chart below shows a visual representation of the disproportionate imposition of out of school suspensions on students with disabilities and referral to law enforcement compared to their nondisabled peers:



*Figure 1 Sources: Guilford County Schools, North Carolina Discipline Data. Civil Rights Data: U.S. Department of Education. (11/22/2024). https://civilrightsdata.ed.gov/profile/us/nc/guilford_county_schools?surveyYear=2020&nces=3701920; Pupils Being Served by Exceptional Children Programs. North Carolina Public Schools Statistical Profile. (11/22/2024). http://apps.schools.nc.gov/ords/f?p=145%3A14%3A1041176435926%3A%3ANO%3A%3AP14_SELECTYEAR%3A2021; Pupils by Grade, Guilford County Schools, North Carolina. North Carolina Public Schools Statistical Profile. (11/22/2024). http://apps.schools.nc.gov/ords/f?p=145%3A102%3A11608709282203%3A%3ANO%3A%3AP102_SELECTYEAR%3A2021.*

## *Educational History*

38.     C.G. was first found eligible for special education services while enrolled

at Oak Ridge Elementary School, within GCS.

39. Principal Denise Francisco was G.C.'s principal at Oak Ridge Elementary. She served as the LEA Representative at many of his IEP meetings.

40. C.G.'s parents exercised their legal right to advocate on C.G.'s behalf by filing an IDEA due process petition against Defendant Board alleging the failure to provide C.G. a free appropriate public education (FAPE) on January 30, 2024.

41. Throughout the contested time period in the Due Process Petition, C.G.'s principal was Denise Francisco, both at Oak Ridge Elementary and Northwest Guilford Middle School. Principal Francisco served as the LEA Representative for almost all of C.G.'s IEP meetings.

42. Principal Francisco was C.G.'s principal when the contested case petition was filed and remained C.G.'s principal when the Settlement Agreement was entered into between Plaintiffs and Defendant Board.

43. The Parties reached a settlement on March 5, 2024, to fully resolve all claims that were, or could have been brought, under the IDEA and the North Carolina special education statutes in the January 30, 2024 contested case petition through the date of the Agreement.

## 2024-2025 School Year
### Eighth Grade

44. C.G. continued to attend Northwest Guilford Middle School for eighth (8th) grade. Principal Francisco remained his principal.

45. During the first month of the 2024-25 school year, Principal Francisco suspended C.G. and recommended his long-term suspension for the remainder of the school year without considering any mitigating factors, including C.G.'s absence of any disciplinary history.

46. C.G.'s general education teachers did not implement the accommodations in his IEP to reduce the academic demands (e.g., modified assignments) and provide additional support to C.G. in the classroom.

47. As C.G.'s assignments were not modified, he continued to struggle with answering questions on assignments.

*September 11, 2024, Independent Speech Evaluation*

48. On September 11, 2024, Ms. Jennifer Minnelli completed an independent educational evaluation to evaluate C.G.'s speech and language functions.

49. Ms. Minelli found C.G.'s "[m]isinterpretation of social information led to a breakdown and misunderstanding as to the [sic] both the sequence and the content of the story. [C.G.] failed to notice subtle social cues including

11

body states depicted in the pictures, which provided key information about the character relationships and overall story arc . . .”

50. Based on C.G.'s “responses to the **SLAM** prompts, he demonstrates a need for support in the following areas: **Generating complex clauses, Narrative and clausal density, Perspective taking, Social problem-solving skills/Self-advocacy, Inferencing.”** (Emphasis in original).

51. Ms. Minnelli opined “[g]iven [C.G.]'s difficulty with narrative language, perspective taking, and reading context, these challenges may persist even with skills interventions due to his lack of awareness of how he presents to unfamiliar speakers.”

## **ALLEGED INCIDENT**

*September 17, 2024*

52. Sometime during the school day on September 17, 2024, C.G. allegedly threatened to shoot Student 3 because he would not give him answers in science class.

53. Student 3 did not make a report to any GCS staff on September 17, 2024, about this alleged threat.

12

54. No other students made a report to any GCS staff on September 17, 2024, about this alleged threat.

*September 18, 2024*

55. On September 18, 2024, Student 1 reported C.G. allegedly made a threat to shoot Student 4 and other students.

56. C.G. was never given any information about the threat he purportedly made.

57. Principal Francisco documented a threat was made "toward the school."

58. At 6:18 p.m., GCS issued a ConnectEd message to parents of an alleged threat at NGMS. Upon information and belief, the ConnectEd message was sent to all members of the NGMS community via telephone and email.

59. At 6:45 pm, GCS staff attempted to call V.G. and E.G. but did not get an answer.

60. At 7:07 pm, GCS staff again attempted to call V.G. and did not get an answer.

61. GCS assistant principals Davis and Matson, along with the GCS School Safety Department, then requested the School Resource Officer (SRO), Deputy Fleiss, go to V.G. and E.G.' s home to "conduct a home visit."

13

62. No GCS agents or staff advised the SRO about C.G.'s disabilities.

63. No GCS agents or staff provided the SRO with any information from C.G.'s individualized education program to assist the SRO in conducting the home visit or interacting with C.G.

64. At the direction of GCS agents, the SRO went to V.G. and E.G.'s home, searched C.G.'s room, and documented all guns in the home were secure and locked.

65. The SRO was the first person to inform the family of what had been reported and the allegations against C.G.

66. When questioned by the SRO, C.G. repeatedly denied making any threat and informed the SRO he did not know anything about a threat.

67. The SRO and GCS then attributed fault to C.G. for his responses, which were in line with his disabilities, when the SRO had not been provided the documentation or any training to prepare him to appropriately address C.G. in the interrogation.

68. The SRO informed C.G.'s parents he did not "feel that there is a threat here and I will take this back to Guilford County Schools."

69. C.G. was not provided an opportunity to explain the allegations to GCS agents or staff prior to the imposition of his first day of suspension – the

14

SRO, acting on behalf of GCS agents advised "the school needed [C.G.] to stay home the next morning. . . ."

70. Notably, on the day this allegation was made, Student 3 stayed home from school on September 18, 2024, as he was not feeling well.

71. Student 3 subsequently reported he told his family of the alleged threats when he woke up at noon on September 18, 2024; however, his parents indicated that was not true. Student 3 did not tell his parents his story of the alleged threat until the following day on the evening of Thursday, September 19, 2024.

*September 19, 2024*

72. At 9:30 a.m., GCS school administrators questioned C.G. about the alleged threat without giving him specific information about what he was accused of saying.

73. This failure to provide the specific information about the accusation(s) violated GCS's Board Policy.

74. C.G. denied making any threats and indicated he would never harm Student 4 or the school.

75. GCS conducted a threat assessment. The Analysis of Student Interview completed after speaking with C.G. indicated "no" to every question and found a "low level of threat" based on C.G.'s interview.

15

76. As part of the investigation, GCS questioned Student 2, the other student who would have been seated between C.G. and Student 1, at the same table in science class when the alleged threat was made. Student 2 did not hear the alleged threat.

77. Principal Francisco questioned the science teacher, who was next to the students while they were working in science class where C.G. was alleged to have made the threat.

78. The science teacher reported he did not hear the alleged threat or "any concerning conversations" involving C.G.

79. Upon concluding her investigation, Principal Francisco contacted Principal Supervisor Dr. Beard.

80. On September 19, 2024, Dr. Beard advised Principal Francisco to close the investigation as the threat was not credible because there was no corroborating evidence that C.G. made the alleged threat.

81. Dr. Beard instructed Principal Francisco to invite C.G. to return to school.

82. Principal Francisco alerted V.G. and E.G. that C.G. could return to school; however, they advised he would not be in attendance at school as he would be participating in a therapy session on the following day.

83. Dr. Beard instructed Principal Francisco "to send out an additional communication to the community, which [she] disregarded and did not do because [she] knew, [she] just had this feeling that that this was not closed and that this was not done and [she] really felt like additional information was there and so [she] did not send that communication even though [she] was directed to do so."

84. Principal Francisco retaliated against C.G. and his family and ignored the directive of her supervisor.

85. By disobeying the direct order of her supervisor, Principal Francisco caused middle schoolers to continue gossiping and speculating about C.G. during his suspension from school on the day of the investigation, so she could get the "additional information" she needed to suspend C.G. and recommend C.G. for a long-term suspension.

86. No one at GCS sent a subsequent communication to the community to clarify the report from the day prior had been handled and deemed not credible.

87. On September 19, 2024, during science class, Student 1 informed Student 3 that C.G. allegedly threatened him.

88. That night, after wrestling practice without receiving the communication that the prior alleged threat had been deemed not

17

credible, Student 3 then reported C.G.'s alleged threats from September 17, 2024, to his parents.

*September 20, 2024*

89.  As his parents had indicated, C.G. did not attend school on Friday, September 20, 2024.

90.  Instead, C.G. attended an appointment with his psychologist to process the false allegations made against him.

91.  Following this appointment, C.G.'s therapist issued a letter noting she had assessed C.G. "for risk of harm to self and others and found none."

92.  Now, three (3) days later and after hearing about the unfounded allegations that were never clarified to the NGMS community, Student 3 reported for the first time to school administrators that C.G. allegedly threated him on September 17, 2024.

93.  Principal Francisco again questioned Student 2—who would have been seated at the same table in science class when the second alleged threat was made. Student 2 did not hear the alleged threat.

94.  Principal Francisco again questioned the science teacher, who had already reported not hearing any "concerning conversations" about the alleged threat.

95. Again, the science teacher who was next to the students reported he did not hear any alleged threat.

96. GCS administrators, including Principal Francisco, did not inform C.G. of Student 3's allegation or ask him any questions about the allegation

97. Without ever hearing from C.G. or advising him of the new also uncorroborated allegation against him, Principal Francisco issued a Notice of Recommendation for Long-term suspension.

98. Notably, Principal Francisco's suspension notice was delivered by the SRO to C.G.'s family.

99. The suspension notice imposed a short terms suspension of ten (10) days allegedly beginning on Monday, September 23, 2024.

100. This suspension notice failed to consider C.G. had been suspended on September 19, 2024, as GCS directed the SRO to advise C.G. not to come to school that day.

101. The suspension notice advised C.G.'s parents Principal Francisco was recommending C.G. be long term suspended for the remainder of the school year

102. C.G.'s last day attending NGMS was September 18, 2024.

103. Principal Francisco issued the Notice of Disciplinary Action on Monday, September 23, 2024. She did not speak with C.G. about the new

allegations or provide him with an opportunity to respond before issuing the new Notice of Disciplinary Action. Principal Francisco did not provide C.G. the opportunity to respond to the allegations as required by North Carolina law and the U.S. Constitution.

104. During the investigation period Principal Francisco was in contact with the GCS hearing officer responsible for hearing appeals, Mr. Kim. Principal Francisco shared contents of NGMS's investigation to prepare Mr. Kim for a potential appeal. At the same time she failed to apprise C.G. or his parents of the exact allegations against C.G.

105. The suspension notice documented C.G. was accused of violating GCS's code of conduct: Rule III-8 Acts of Terror, which is defined as follows:

> No student shall threaten to commit an act of terror on school property or at the site of a school activity that is designed to cause, or is likely to cause, serious injury or death to another person, ***when the threat is intended to cause, or actually causes, a significant disruption to the instructional day or a school-sponsored activity***. No student shall make a report that they know is false, that an act of terror designed to cause, or likely to cause, serious injury or death to another person on school property or at the site of a school-sponsored activity is imminent, when that report is intended to cause, or actually causes, a significant disruption to the instructional day or a school-sponsored activity.

(Policy 4300-R1) (emphasis added).

20

106. Level III infractions, like Rule III-8 contemplate consequences that can include any penalties from Levels I or II, an out-of-school suspension lasting from one to ten days, reassignment to an alternative learning program or school. (Policy 4300-R1).

107. Level I, II, or III violations do not contemplate a long-term suspension without the student repeatedly violating the conduct code; however, GCS provides principals with "the discretion to impose different, less severe, or more severe consequences that are the appropriate pedagogical and safety response to the situation at hand." (Policy 4300-R1) (emphasis in original).

108. GCS directs principals "to consider and be guided by the following mitigating and aggravating factors":

> Mitigating Factors: The principal or designee may choose to reduce the level of the violation when mitigating factors exist, which include but are not limited to:
>
> - The student did not and would not be expected to understand the full impact of their decision due to the age, grade level, and/or cognitive ability of the student;
> - The student has not engaged in the type of conduct before;
> - The student has no record of violating the Code of Student Conduct before;
> - The student acknowledges the violation and indicates an understanding that they will not repeat the conduct;
> - The conduct had a minimal impact on the educational environment;

- The conduct did not harm other students or staff; and/or
- Imposing a lower level of disciplinary intervention will not cause disruption to the educational environment or threaten the safety of other students at the school.

Aggravating Factors: The principal or designee may choose to increase the level of the violation when aggravating factors exist, which include but are not limited to:

- The student is in high school;
- The student is of an age and grade level that they are expected to understand the impact of their decision;
- The student has engaged in the type of conduct before;
- The conduct involved a combination of multiple rule violations;
- The student has violated the Code of Student Conduct before;
- The student does not acknowledge the violation;
- The conduct impacted the learning of other students;
- The conduct caused harm to other students or staff;
- The conduct disrupted the educational environment;
- Continued presence of the student on campus is likely to cause disruption or unsafe conditions; and/or
- The student incited others to engage in dangerous or disruptive conduct.

109. Even in the Notice of Suspension, Principal Francisco still failed to provide C.G. and his family with detailed information about the allegations against C.G. The entire description of the incident was two (2) sentences:

On 9/17 [C.G.] stated to a student that he was going to shoot him. The next day on 9/18 [C.G.] stated to a different student that he was going to shoot up the school and target a particular student.

22

110. C.G. was never given the opportunity to respond to the allegations against him, sparse as they were, prior to the imposition of the ten (10) day suspension.

111. Principal Francisco was directed to cease her investigation of the first threat after it was found to be uncorroborated.

112. However, upon receiving information about a second, unrelated incident that was also uncorroborated, Principal Francisco recommended long-term suspension and imposed with immediate effect a 10-day suspension for C.G.

113. Upon information and belief, GCS has a custom, policy, or practice of failing to appropriately investigate disciplinary allegations against students with disabilities.

114. In furtherance of GCS's plan to exclude C.G. from NGMS for his family's lawful assertion of his rights as a student with a disability, Principal Francisco seized upon this opportunity to remove C.G. from her school.

**Manifestation Determination Review Meeting**

115. As C.G. is a student with a disability, he is entitled to the protections that the Individuals with Disabilities Education Act (IDEA) affords students with disabilities who are subjected to their school's disciplinary actions.

23

116. An IEP team convened on September 26, 2024 to determining whether C.G.'s alleged conduct was a manifestation of his disabilities.

117. Prior to the MDR, and despite the fact that the invitation indicated a copy of the Parents Rights and Responsibilities in Special Education: Notice of Procedural Safeguards was enclosed with the Invitation to the MDR Meeting, none was provided.

118. During all IEP meetings, the school must have a local education agency (LEA) representative present.

119. The LEA representative has the authority and responsibility to serve as the final decisionmaker in a meeting if there is not consensus.

120. During C.G.'s MDR meeting, Principal Francisco served as the LEA representative and therefore had the final decision-making authority as to whether C.G.'s conduct would be determined to be a manifestation of his disability.

121. Over the objections of C.G.'s family, GCS determined C.G.'s alleged behavior was not a manifestation of his disability.

122. GCS refused to consider the speech-language evaluation the family had received and shared with GCS the evening before the MDR meeting falsely documenting "Parent does not have any additional information at this time." 20 U.S.C. § 1415(k)(1)(E)(i).

24

123. Dismissing the relevance of the outside speech evaluation as relevant to the MDR, GCS's counsel informed the IEP team that the outside evaluation was not part of C.G.'s record because it had not been considered by the IEP team.

124. C.G.'s attorney pointed to the information from the assessments Ms. Minnelli conducted earlier that month documenting his deficits in social narration, difficulty understanding emotions, underdeveloped social pragmatic skills, below average scores in self-advocacy and inferencing, diminished ability to make inferences, perspective taking, and a decreased ability to make inferences based on non-verbal cues.

125. During the MDR the IEP team from NGMS failed to consider relevant medical documentation relevant to the proceedings and instead found that the alleged behavior could not be a manifestation of C.G.'s disability.

126. Principal Francisco headed the investigation into C.G.'s alleged conduct.

127. Principal Francisco then determined C.G. was to be suspended for an additional ten (10) days following the completion of her investigation

128. Principal Francisco recommended to the GCS superintendent that C.G. be long term suspended for the remainder of the year.

129. Principal Francisco did not delegate someone else to serve as the LEA representative for C.G.'s MDR meeting.

130. Instead, Principal Francisco was the final decisionmaker in the MDR meeting. In the event her staff at NGMS found C.G.'s behavior to *be* a manifestation of his disability, Principal Francisco could override that determination.

131. During the meeting, the MDR team used the language from the Notice of Disciplinary Action and did not conduct additional investigation into the facts of the incident. The language in the Notice of Disciplinary Action was incomplete and failed to include the absence of any corroborating witnesses.

132. Plaintiffs timely noticed their appeal of the recommendation for long term suspension.

133. Almost two (2) weeks after the investigation of C.G.'s home where the SRO informed C.G.'s parents that he did not see C.G. to be a threat or find evidence C.G. had made a threat while at their house, and he also understood other parents would be notified the threat was unfounded, the SRO then filed two (2) Petitions with Juvenile Justice against C.G. based on exactly the same information Principal Francisco used as the basis for suspending C.G.

134. As GCS had not provided the SRO with any information about C.G.'s disabilities, he later reported to Juvenile Justice that C.G. was

"uncooperative" and "unresponsive" when the SRO interrogated him at his home.

135. As GCS had never provided the SRO with C.G.'s IEP or educational records related to his disability, the SRO (nor GCS) provided that information as required to the Juvenile Court Counselor evaluating C.G.'s case.

136. GCS refused to provide C.G. the services in his IEP, including his daily instruction in the Wilson Reading System, during the pendency of his appeal unless C.G. attended the alternative learning program at SCALE school, which was not required by Board policy during the appeal process. Again, GCS was unaware of its own Board policies and discriminated against C.G. by imposing additional restrictions on his education and learning.

137. Despite Principal Francisco contacting the hearing officer, James Kim, to confer throughout the course of her investigation into the allegations against C.G., GCS scheduled Mr. Kim to be the hearing officer for the appeal of the long term suspension.

138. Mr. Kim did not admonish Principal Francisco it was inappropriate to contact him about her investigation evidencing the Board's policy,

27

practice, and custom of intertwining the disciplinary investigative process with the purportedly separate hearing officer.

139. After objections, GCS found a hearing officer who had not conferred with Principal Francisco throughout the course of her investigation into the allegations.

**Appeal to Hearing Officer**

140. On October 7, 2024, Plaintiffs participated in a hearing that was to be held pursuant to N.C. Gen. Stat. § 115C-390.7(b) to appeal the recommendation for C.G.'s long term suspension.

141. In accordance with state law, Plaintiffs were entitled to "review before the hearing . . . the information supporting the suspension that may be presented as evidence at the hearing, including statements made by witnesses related to the charges . . . ." N.C. Gen. Stat. § 115C-390.8(e)(3).

142. Plaintiffs were not provided the information supporting the suspension prior to the hearing. In fact, Principal Francisco, Assistant Principal Matson, and Assistant Principal Davis failed to turn-over their investigatory notes that were used as evidence in their testimony during the hearing.

143. Defendant Board has failed to train its employees responsible for implementing the disciplinary investigations on the proper procedures.

28

Defendant has a custom, policy, and practice of not training staff on appropriate implementation of discipline procedures as outlined in state law.

144. C.G.'s parents participated in an appeal of Principal Francisco's recommendation for long-term suspension for the remainder of the school year. Ms. Eva DuBuisson served as the Hearing Officer after C.G.'s counsel raised concerns with Mr. Kim's impartiality due to Principal Francisco providing him information throughout her investigation.

145. During the hearing, Principal Francisco and other members of administration referenced and utilized their personal notes, which were not provided to C.G. prior to the hearing. Even after C.G.'s counsel noted on the record these notes were not provided, GCS never provided the notes.

146. Each of the administrators also testified to additional facts from their investigations that Principal Francisco relied upon to inform her decision to recommend long-term suspension that were not provided to C.G. prior to the hearing. These additional facts became part of the record of appeal despite C.G. never receiving this information contrary to state law.

147. The Board has a policy, custom, and practice of failing to turn over "the information supporting the suspension that may be presented as evidence at the hearing" contrary to state law. N.C.G.S. § 115C-390.8(e)(3).

148. Ms. DuBuisson issued a decision for "Casey Gibbs." Presumably, the decision was for C.G., but Ms. DuBuisson failed to identify his name correctly.

149. The Hearing Officer's findings ignore the timeline of the events and confuse their order.

150. The Board must consider the timeline because at the foundation of these events, Student 1 makes a report that is deemed "unfounded," Student 1 and Student 3 discuss the alleged threat, and then Student 3 makes a report of a completely unrelated alleged threat. No one heard any of these alleged threats. C.G. repeatedly denies making these threats, and the student and teacher who were present did not hear or report either of the alleged threats. There is no corroboration—and the Hearing Officer did not identify any of the "sufficient corroborating evidence" allegedly presented by the school administration.

151. The Hearing Officer's findings ignore GCS's denial of a fundamentally fair process for C.G. By way of example and not limitation, all three (3)

30

school administrators admitted to having taken notes during the investigation, which were not provided to C.G. prior to the hearing.

152. Principal Francisco and Ms. Matson specifically referred to these undisclosed notes during their testimony before the Hearing Officer. Some of Principal Francisco and Ms. Matson's testimony regarding the content of their notes conflicted with evidence already in the record provided to C.G.'s family; yet it was impossible to effectively question the administrators on the newly disclosed evidence, which is what the North Carolina General Statutes were designed to prevent.

153. Ms. DuBuisson's decision contained factual inaccuracies regarding the information in the record including, but not limited to, adopting Principal Francisco's statement that Student 3 had not spoken to Student 1 because Student 3 was absent on September 19, 2024. As the evidence in the record shows, Student 3 was present on September 19, 2024, and spoke to Student 1 about the alleged threat before making his report on September 20, 2024.

154. Ms. DuBuisson found C.G. did not have the subjective intent to carry out the alleged threats, nor did he bring a weapon to school. She did not uphold Principal Francisco's recommendation of long-term suspension

31

and assigned C.G. to an alternative learning program (SCALE) for the remainder of the first semester.

155. C.G.'s parents noticed their appeal of Ms. DuBuisson's decision to the Board of Education.

156. Section 115C-390.6 require the school principal provide a student an opportunity for an informal hearing, to be informed of the charges and the basis for the accusations, and to make statements in defense or mitigation of the charges. This protection was not offered to C.G. prior to his suspension. N.C. Gen. Stat. §§ 115C-390.6.

157. Section 115C-390.7 states long-term suspension can only be recommended by a principal when a "student [] willfully engages in conduct that violates a provision of the Code of Student Conduct that authorizes long-term suspension." N.C. Gen. Stat. § 115C-390.7.

158. Respondent has never demonstrated or alleged that C.G. willfully engaged in conduct that was a violation authorizing a long-term suspension. N.C. Gen. Stat. § 115C-390.7.

159. To the contrary, the hearing officer found C.G. did not have "the subjective intent to carry out these threats."

32

160. Despite the lack of corroborating evidence, the hearing officer determined C.G. had made the threats. However, rather than imposing the long-term suspension as recommended by Principal Francisco, the hearing office altered the punishment to be a disciplinary reassignment to SCALE.

161. The decision provided the opportunity to appeal to the GCS Board.

162. Plaintiffs timely appealed the hearing officer's decision for C.G.'s disciplinary reassignment.

## **Board Appeal**

163. On October 22, 2023, Plaintiffs appeared in front of a panel of three (3) GCS Board members for the appeal.

164. During the hearing in front of the three (3) member panel, Principal Francisco again testified.

165. Again, Principal Francisco presented new information, which notably had never been disclosed to C.G. or his family, as being factual to this new group of listeners.

166. At the Board hearing, Principal Francisco took the opportunity to again add to her story with additional information she relied upon in her investigation that she claimed informed her decision to recommend long-term suspension. This additional information was never provided to C.G.

167. At the Board hearing, Principal Francisco misinformed the Board there were three (3) separate threats instead of the two (2) that she allegedly previously investigated and reported.

168. Principal Francisco, to further the retaliation and discrimination against C.G. and his family, continued to build upon her story to ensure C.G. would not return to her school. She included additional statements and information never provided to C.G., his family, or his counsel

169. Offering evidence of GCS's custom, policy, and practice of discriminating against students with disabilities throughout the disciplinary process, Principal Francisco stated she "followed all district protocols as [she] navigated the investigation.

170. Further, Principal Francisco conflated C.G.'s Constitutional and statutory due process rights with a threat assessment protocol

171. Principal Francisco indicated she believed she could delegate her responsibilities in the investigation to the SRO.

172. At the end of the hearing, a Board member explained to C.G.'s family they would take the panel's decision as a recommendation to the full Board. At the hearing for the review of C.G.'s disciplinary reassignment, the Board was unaware of its procedures for providing "due process" to C.G., a student with a disability.

34

173. In yet another example of the Board's failure to train, the Board was not aware of its own policies and their implementation – the panel of three (3) did have the power to make a determination about C.G.'s discipline.

174. In a 2 -1 vote, the panel voted to uphold the reassignment to SCALE for the remainder of the semester with the conditions set forth by Ms. DuBuisson.

175. The dissenting Board member wrote a letter on C.G.'s behalf to present to the juvenile court counselor which included the following:

- *We are basing a decision with most information that isn't substantiated with credible evidence in my opinion.*
- *Allegations are not substantiated by all that were within a credible distance, including students and a staff member.*
- *There is no history to support a potential threat or pattern.*
- *Due to the seriousness, there should be a high threshold and basis for the punishment. I do not believe that those were met in this situation.*
- *The conclusion of no credible threat was reached and then removed without credible evidence or the chance to refute the accusations.*
- *A potential school threat should be acted on and addressed quickly. I firmly believe none was present or credible with the information provided.*
- *This matter should have been handled in a different manner to be addressed with all involved.*

### ***Ongoing Harm***

176. C.G. is no longer allowed to attend school at NGMS, his base school.

35

177. Instead, C.G. now attends school at SCALE where he cannot go to the bathroom independently as all students must be supervised.

178. SCALE has students wearing ankle monitors as part of their probation through the North Carolina Division of Prisons.

179. C.G. is now attending therapy with two (2) separate therapists in an attempt to work through the trauma caused to him by (1) the false allegations against him, (2) GCS's inadequate investigation into the allegations, (3) his loss of a fundamental liberty and property interest, and (4) his reputational harm of not being able to attend another school with this false disciplinary report on his school record.

180. V.G. and E.G. are also now attending therapy as a direct and proximate result of GCS's actions.

181. V.G. and E.G. have been and continue to be unable to work their regular hours since the initiation of this disciplinary process as a direct and proximate result of GCS's actions.

182. Once C.G.'s parents noticed their appeal of Principal Francisco's recommendation for long term suspension, upon information and belief, GCS directed the SRO to initiate juvenile charges against C.G.

183. The SRO referred C.G. to juvenile justice on or about September 30, 2024, for communicating threats in violation of North Carolina law.

184. C.G. now has juvenile, criminal charges pending against him for unfounded allegations.

185. These charges through the North Carolina Department of Juvenile Justice further C.G.'s reputational harm.

## **CLAIMS FOR RELIEF**

### COUNT I

Discrimination Based on Disability in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq.

1. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

2. Plaintiff C.G. is a "handicapped person" as defined by the regulations of Section 504 of the Rehabilitation Act ("Section 504") and is otherwise qualified to attend school in Defendant Board's school district and access the general education program with non-disabled peers. 34 C.F.R. § 104(3)(j)(1); 34 C.F.R. § 103(3)(1)(2).

3. Section 504 applies to each recipient of federal financial assistance from the Department of Education and to the program or activity that receives such assistance. 34 C.F.R. § 104.2. Defendant Board is a "recipient of Federal financial assistance from the Department of Education" that operates a program or activity as defined by the regulations of Section 504. 34 C.F.R. § 104.38; 34 C.F.R. 104.34.

37

4. Section 504 prohibits public entities, including local educational agencies (LEAs), from "exclud[ing] from the participation in, [ ] den[ying] the benefits of, or [ ] subject[ing] to discrimination" any otherwise qualified person with a disability from any program or activity receiving federal financial assistance solely by reason of her or his disability. 29 U.S.C. § 794(a).

5. The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400 et seq., states that "[a]n agency reporting a crime committed by a child with a disability must ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime." 34 CFR § 300.535.

6. Disclosure of student information is limited by the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g; however, educational institutions can disclose personally identifiable information (PII) from a student's education records in emergencies if it is necessary to protect the health or safety of the student or others. 34 CFR § 99.36. When determining whether schools can disclose student information if necessary to prevent harm, school staff should consider the totality of the circumstances, as long as there is a rational basis for the decision. 34

38

CFR § 99.36.

7. A School Resource Officer (SRO) can only receive personally identifiable information (PII) from student education records if they are considered a "school official" under FERPA. 34 CFR § 99.33(a)(2). An SRO can qualify as a school official, if the educational unit has "outsourced institutional services or functions" to the individual, which would otherwise be performed by employees. 34 CFR § 99.31(a)(1)(i)(B). SROs may only use the PII from education records for the purposes for which the disclosure was made, e.g., to promote school safety and the physical security of the students. 34 CFR § 99.31.

8. Under Guilford County Schools Policy Regulation Code 4700-R, student records can be released without parental or eligible student consent under specific circumstances. These include when school personnel, who have legitimate educational interests and are directly involved in the educational process, need access to the records. Additionally, records may be disclosed in extreme emergencies when it is necessary to protect the health and safety of the student or others. Such disclosures may also occur when required by state or local officials in accordance with state and federal law, such as the IDEA.

9. Defendant Board discriminated against C.G. by excluding him from

39

participation in a program and denying him the benefits of a program solely on the basis of his disability through its disciplinary proceedings commencing on September 18, 2024.

10. Defendant Board acted in bad faith and with gross misconduct when it failed to properly train administrators, staff, and in-school contractors, such as the school resource officer (SRO) on how to properly investigate including, but not limited to, conducting interviews, surrounding alleged misconduct by a student with disabilities.

11. Defendant Board and its subordinates acted with bad faith and with gross misjudgment when it failed to provide C.G.'s disability status and IEP to the SRO, misrepresented to C.G.'s parents that school staff were implementing his IEP at the manifestation determination review (MDR) meeting required by federal law, failed to properly conduct C.G.'s MDR in accordance with federal law, failed to provide C.G. the minimum due process required by North Carolina law and the U.S. Constitution, recommended C.G. for long term suspension without weighing the relevant mitigating and aggravating factors as required by State law, and subsequently reassigned C.G., a student with disabilities and no prior discipline history, to an alternative learning program for students with significant maladaptive behaviors.

40

12. Defendant Board is vicariously liable for the bad faith actions and gross misjudgment of its subordinates including by way of example and not limitation:

a) Causing C.G. to miss instructional time due to the failure to conduct a proper investigation of the allegations against him and unlawfully removing C.G. from school with *no* corroborating evidence;

b) Causing C.G. to be reported to the North Carolina Department of Juvenile Justice due to the SRO deeming C.G. "uncooperative" and "unresponsive" because Principal Francisco did not provide the SRO notice of C.G.'s disabilities and a copy of C.G.'s IEP prior to sending the SRO to question C.G. at his home;

c) Limiting C.G.'s access to school and educational services due to his disabilities, which hindered his inability to self-advocate or provide a cogent narrative when questioned by the SRO and school officials; and

d) Failing to properly train its subordinates on the discipline procedures and protections afforded to students with disabilities under federal law resulting in C.G.'s exclusion from school and ultimate removal from his neighborhood school and reassignment

41

to an interim alternative educational setting for months.

13. Defendant knew the disciplinary process denied C.G. equal access to education as his similarly-situated, non-disabled peers.

14. As a direct and proximate result of Defendants' discrimination based on C.G.'s disability, Plaintiffs sustained, and continue to sustain, damages in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), the amount to be determined at trial. Plaintiffs' damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment; and

   b) Medical bills, counseling, and other costs and expenses for future psychological care; and

   c) Attorneys' fees.

## COUNT II

Discrimination Based on Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

15. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

16. C.G. is a "qualified individual with a disability," as defined by the ADA, 42 U.S.C. § 12131(2).

17. Defendant Board is a "public entity" within the meaning of the ADA. 42

42

U.S.C. § 12131(2).

18. Title II of the ADA and Section 504 are closely related, and "there is no significant difference in the analysis of rights and obligations created by the two Acts." *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013) (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002)).

19. Title II of the ADA states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

20. A public entity must not "provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii).

21. A public entity must administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *Id.* § 35.130(d).

22. Under the ADA, public schools are responsible for the discriminatory

43

actions of school officials and school employees.

23. Defendant Board has violated Title II of the ADA by excluding C.G. from the benefits and services of a publicly funded educational institution. Defendant Board's actions towards C.G. are consistent with the discriminatory disciplinary consequences imposed by Defendant Board to other students with disabilities.

24. By Defendant Board's actions and inactions were motivated by his disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

25. Defendant Board failed to train, oversee, and hold its employees accountable for properly conducting disciplinary proceedings on students with disabilities in the Exceptional Children Services (ECS) program, such as C.G., contrary to federal law, state law, and Board policy.

26. Defendant Board was aware of the disproportionality of the disciplinary consequences imposed on students with disabilities, like C.G., because it reported the data to the Office for Civil Rights (OCR).

27. Defendant Board failed to provide students with disabilities in the ECS program, like C.G., with reasonable accommodations and supports that would enable him "equal opportunity to obtain" or reach the "same level of achievement as that provided to others" by training staff and

44

administrators on how to properly interact with and question students, like C.G., who have disabilities during disciplinary investigations.

28. GCS failed to alert the SRO, Deputy Fleiss, of C.G.'s IEP and disability status when he, at the administration's request, went to investigate the Grimm's home and interrogate C.G. about the allegations the school had received.

The SRO and GCS then attributed fault to C.G. for his responses, which were in line with his disabilities, when the SRO had not been provided the documentation or any training to prepare him to appropriately address C.G. in the interrogation.

29. As a direct and proximate result of Defendants' discrimination based on C.G.'s disability, Plaintiffs sustained, and continue to sustain, damages in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), the amount to be determined at trial. Plaintiffs' damages include, but are not limited to:

   a. Past, present and future psychological pain, suffering, and impairment; and

   b. Medical bills, counseling, and other costs and expenses for future psychological care; and

   c. Attorneys' fees.

45

## COUNT III

Retaliation in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

30. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

31. Section 504 and the ADA, both prohibit retaliation against students with disabilities. The anti-retaliation provisions of both laws are essentially identical and therefore are analyzed together; "retaliation claims under § 504 are subject to the same standard as ADA retaliation claims." *S.B. ex rel. A.L. v. Board of Educ. of Harford Cnty.*, 819 F.3d 69, 78 n.6 (4th Cir. 2016). Section 504 incorporates the anti-retaliation language of Title VI of the Civil Rights Act of 1964, which "prohibits recipients from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege . . . or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. §104.61 and 34 C.F.R. §100.7(e).

32. No public or private entity may discriminate against individuals for engaging in protected activities, such as opposing discriminatory practices or participating in investigations or proceedings under the

ADA. 28 CFR § 36.206; *see also Reynolds v. American Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Additionally, the regulations implementing Section 504 make it unlawful to "[i]ntimidate or retaliate against any individual ... for the purpose of interfering with any right secured by [the Rehabilitation Act]." 28 C.F.R. § 42.503(b)(1)(vii).

33. The purpose of these statutes is to protect the students and their advocates in collaborating and supervising the child's education program to explicitly "balance the natural advantage of districts." *Schaffer v. Weast*, 546 U.S. 49 (2005).

34. To state a prima facie retaliation claim a plaintiff must allege that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." See *Manning v. N. Carolina State Univ.*, 724 F.Supp.3d 438, 461 (E.D.N.C. 2024).

35. A retaliation claim should be reviewed using the *McDonnell Douglas* burden-shifting framework. *See Williams v. Brunswick Cnty. Bd. of Educ.*, 440 Fed. Appx. 169, 171 (4th Cir. 2011) (unpublished); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

36. If the plaintiff can state a prima facie case for retaliation under the ADA

47

and Section 504 then the burden shifts to the defendant, under *McDonnell Douglas*, to "articulate a 'legitimate nonretaliatory reason for its actions,' at which point the burden shifts back to [the plaintiff] to 'demonstrate that the proffered reason is a pretext for forbidden retaliation.'" *S.B.*, 819 F.3d at 78.

37. To show a causal relationship between the protected activity and the retaliatory action, a plaintiff generally must allege an "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." *Singletary ex rel. N.M.M. v. Cumberland Cnty. Schools,* No. 5:12-CV-744-FL, 2013 WL 4674874, at *9 (E.D.N.C. Aug. 30, 2013) (citing *Lauren W. ex rel Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.2007)).

38. Retaliatory action is defined broadly. "The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996).

39. An adverse action must be sufficiently "materially adverse" to "give rise to a retaliation claim." *J.M. v. Wake Cnty. Bd. of Educ.*, No. 5:21-CV-344-FL, 2022 WL 3705021, at *11 (E.D.N.C. Aug. 26, 2022) (citing *S.B.* , 819 F.3d at 78; *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th

48

Cir. 2018)). It need not involve a tangible action, but any action that is likely to deter the individual from accessing remedial actions provided by the statute would be considered material. *Id.*

40. An adverse action must be causally related to the protected activity, however, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden. *See Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335 (4th Cir. 2018); *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation.")

41. Purported victims of retaliation do not have to show at the prima facie stage that their protected activities were but-for causes of the adverse action. *Strothers,* 895 F.3d at 335. A plaintiff need not establish but-for causation until the pretext stage of burden-shifting framework. *Foster v. U. of Maryland-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015).

42. Temporal proximity can help establish causation where the adverse action comes closely after the protected activity, and where "such temporal proximity . . . is significant enough" can meet "the burden alone." *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013).

43. Defendant Board retaliated against C.G. and his parents for exercising

49

their legal right to advocate on his behalf by filing an IDEA due process petition.

44. Defendant Board knew C.G. was a child with a disability but chose not to inform the GCS SRO of his disabilities prior to sending him to C.G.'s home to investigate and question C.G. regarding the accusations against him, despite the obligation under federal law to do so.

45. Once the accusations were deemed unfounded, Principal Francisco, purposefully decided to disobey an order from her supervisor to notify the school community the threat was unfounded, allowing the students and their families to continue to discuss the false allegations against C.G. during his absence from school.

46. After conferring with Student 1, Student 3 then reported a new allegation against C.G., which was also uncorroborated. Principal Francisco chose not to informe C.G. of the new allegations against him or provide him with an opportunity to respond prior to deciding to suspend him from school and recommend his long-term suspension for the remainder of the school year. During her investigation, Principal Francisco contacted the GCS Hearing Officer, Mr. Kim, who was supposed to serve as the hearing officer at C.G.'s long-term suspension hearing, to inform him of specifics related to her investigation of C.G.

47. Principal Francisco served as the LEA Representative at C.G.'s MDR. When there was not a consensus, Principal Francisco made the final decision that C.G.'s conduct was not a manifestation of his disabilities.

48. At both the hearing before the GCS Hearing Officer and the subsequent appeal to the Board, Defendant Board did not provide C.G. with all the evidence to be used against him contrary to State law.

49. Even though C.G. was not required to attend SCALE, the interim alternative disciplinary placement, during the pendency of his appeal to the Board, Defendant Board refused to provide him with the services in his IEP.

50. As a direct and proximate result of Defendants' retaliation against C.G. and his family due to their advocacy on behalf of C.G. to receive appropriate services for his disability, Plaintiffs sustained, and continue to sustain, damages in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), the amount to be determined at trial. Plaintiffs' damages include, but are not limited to:

    a. Past, present and future psychological pain, suffering, and impairment; and

    b. Medical bills, counseling, and other costs and expenses for future psychological care; and

c. Attorneys' fees.

COUNT IV

Violation of the Fourteenth Amendment
42 U.S.C. § 1983

51. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

52. Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

53. The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws" or "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

54. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that

52

support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

55. Additionally, C.G., a child with a disability, has statutorily protected rights provided by Section 504 and Title II of the Americans with Disabilities Act.

56. Deprivations of constitutionally [and statutorily] protected rights may arise due to "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

57. "[P]olicy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of [government] employees, *see Wellington v. Daniels*, 717 F.2d 932 (4th Cir. 1983) (police brutality), or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227 (4th Cir. 1984); *see also Avery v. County of Burke*, 660 F.2d 111 (4th Cir. 1981).

58. There are four (4) ways to allege a policy or custom:

53

> Through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission . . . that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Oliver v. Baity*, 208 F. Supp.3d 681, 689 (M.D.N.C. 2016) (internal quotation marks omitted)

59. Pursuant to 42 U.S.C. § 1983, "persons" acting under color of state law who violate the United States Constitution may be sued. Federal law, not state law, determines whether a governmental body qualifies as a "person" subject to suit under § 1983.

60. A government actor's conduct may rise to the level of a substantive due process violation if the conduct is arbitrary or conscience shocking. *Collins v. City of Harker Heights*, 503 U.S. 115, 116 (1992); *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001) (holding substantive due process claims against individual defendant and school district could move forward as student had "constitutional 'right to be free from the use of excessive force' in the 'non-seizure, non-prisoner context' in school.").

61. Section 1983 liability due to failure to train is established "where it can be shown that policymakers were aware of, and acquiesced in, a pattern

of constitutional violations involving the exercise of [] discretion, ... [which pattern] could put the municipality on notice that its officers confront the particular situations on a regular basis, and that they often react in a manner contrary to constitutional requirements." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989).

62. Additionally, "the unconstitutional consequences of failing to train [can also] be so patently obvious that [an actor] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

63. A school board may be found to have supervisory liability for a Section 1983 claim if the plaintiff shows "actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999).

64. C.G. is entitled to appropriate due process before depriving him of access to his education and academic supports and to equal protection of the laws. U.S. Const. amend XIV.

65. Defendant Board and its employees were at all relevant times persons acting under color of state law, empowered and required by the State of

55

North Carolina to, among other things, ensure equal access to receive the education guaranteed under North Carolina law, and an educational environment free disability-based discrimination and to the procedural and substantive due process guaranteed under the United States Constitution and State law.

66. Defendant knowingly violated C.G. and his parents' procedural and substantive due process rights when it:

   a) Failed to inform C.G. of the allegations brought against him;

   b) Failed to provide C.G. the opportunity to contest or provide context to the allegations brought forward by Student 3 prior to imposing his suspension and recommending him for long-term suspension;

   c) Failed to inform the SRO of C.G.'s disability status or to provide him with C.G.'s IEP prior to sending him to investigate and interview C.G.;

   d) Refused to follow the IDEA's procedural requirements before and during the MDR resulting in a substantive denial of FAPE;

   e) Communicated with the GCS Hearing Officer, Mr. Kim, during the investigation in anticipation of an appeal of the forthcoming recommendation for C.G.'s long-term suspension;

   f) Failed to provide all evidence that would be used against C.G.

during both the appeal to the GCS Hearing Officer and again during the appeal to the Board;

g) Removed C.G. from school without providing the due process rights guaranteed by State law and United States Constitution; and

h) Impugned C.G.'s reputation.

67. Defendant Board knew its subordinates had violated C.G.'s clearly established rights as established under State and federal law and United States Constitution.

68. The acts by Defendant Board constitute a disregard for, and deliberate indifference to, C.G.'s constitutionally protected interests, including his procedural due process rights and substantive due process rights to his property interest in educational benefits and his liberty interest in his reputation.

69. Defendant Board established a custom, policy, and practice of failing to train its employees and failing to enforce federal and state law requirements as well as GCS Board Policy by way of example by:

a) Imposing harsher disciplinary consequences on students with disabilities, including C.G., than non-disabled students;

b) Failing to inform law enforcement of a child's disability and

57

provide SROs with the IEPs of disabled children prior to sending them to investigate allegations of possible criminal acts and interview disabled students, including C.G.;

c) Failing to provide the minimum due process required by North Carolina law and the U.S. Constitution prior to a short-term suspension or during the long-term suspension proceedings to disabled students, including C.G.;

d) Failing to follow the procedural and substantive requirements for conducting MDRs of disabled students, including C.G., to properly assess whether the conduct in question is a manifestation of the child's disabilities;

e) Failing to follow the requirements of the ADA and Section 504 to ensure that students with disabilities, like C.G., are treated equitably, and like their non-disabled peers throughout disciplinary investigations, proceedings, and the imposition of disciplinary consequences;

f) Failing to provide the Juvenile Court Counselor with C.G.'s IEP and inform them of C.G.'s disability status;

g) Failing to ensure Board members conducting discipline appeal hearings were aware of and understood Board policy; and

58

h) Failing to provide an impartial hearing officer as evidenced by Principal Francisco's documented ongoing conversations with Mr. Kim throughout her investigation of C.G.

70. Defendant Board knew of its subordinates' lack of understanding regarding their duties under the law as Defendant Board heard the appeal of C.G. and other disabled students and knew it was disproportionately suspending students with disabilities.

71. Defendant Board demonstrated deliberate indifference by failing to train its employees, as the need for training was so obvious and the inadequacy so likely to result in a violation of constitutional rights;

72. As a direct and proximate result of Defendant's violations of the Fourteenth Amendment, Plaintiffs sustained, and continue to sustain, damages in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), the amount to be determined at trial. Plaintiffs' damages include, but are not limited to:

a. Past, present and future psychological pain, suffering, and impairment; and

b. Medical bills, counseling, and other costs and expenses for future psychological care; and

c. Attorneys' fees.

59

## COUNT V
### Appeal of the Final Decision of the Defendant Board
### N.C.G.S. § 115C-45(c)

73. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

74. North Carolina has adopted specific procedures to protect students' due process rights in their education. N.C. Gen. Stat. §§ 115C-390 *et seq.* These statutes provide the minimum due process protections for students facing suspension, both for short-term and long-term suspensions, including notice procedures and opportunities to be heard. N.C. Gen. Stat. §§ 115C-390.6, 390.8.

75. A principal has the authority to impose a short-term suspension "on a student who ***willfully*** engages in conduct that violates a provision of the Code of Student Conduct authorizing short-term suspension." N.C. Gen. Stat. § 115C-390.5 (emphasis added). Merriam-Webster defines "willfully" as "deliberately" and "intentional."

76. Under North Carolina law, students facing short-term suspension are afforded specific due process protections. N.C. Gen. Stat. § 115C-390.6. Prior to the imposition of a short-term suspension, school administration must provide the student with an informal hearing. N.C. Gen. Stat. § 115C-390.6(a). "The student has the right to be present, to be informed

60

of the charges and the basis of the accusations, and to make statements in defense or mitigation of the charges." N.C. Gen. Stat. § 115C-390.6(a). This right to a hearing is only abrogated when "**_the presence of the student_** creates a direct and immediate threat to the safety of other students or staff, or substantially disrupts or interferes with the education of other students or the maintenance of discipline at the school." N.C. Gen. Stat. § 115C-390.6(b) (emphasis added).

77. The Hearing Officer erred in finding the long-term suspension hearing— after the disciplinary consequence was imposed—provided sufficient due process.

78. Defendant Board adopted the following definition for Rule III-8 Acts of Terror:

> No student shall threaten to commit an act of terror on school property or at the site of a school activity that is designed to cause, or is likely to cause, serious injury or death to another person, when the threat is intended to cause, or actually causes, a significant disruption to the instructional day or a school-sponsored activity. No student shall make a report that they know is false, that an act of terror designed to cause, or likely to cause, serious injury or death to another person on school property or at the site of a school-sponsored activity is imminent, when that report **is intended to cause**, or actually causes, a significant disruption to the instructional day or a school-sponsored activity. (emphasis added).

79. The Hearing Officer found C.G. did not have "the subjective intent to

carry out these threats, nor did he bring a weapon to school" as a mitigating factor. However, to support a short-term suspension, Principal Francisco was required to prove C.G. intended to threaten the students and cause a particular outcome.

80. As noted above, C.G. did not willfully violate Rule III-8, and Rule III-8 does not authorize long-term suspension. Even accepting the Policy provided Principal Francisco the discretion to increase the penalty, she was required to consider and be guided by the mitigating and aggravating factors, which she did not do.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs request the judgment of the Court against Defendant as follows:

1. Find and declare that Defendant has discriminated against C.G. on the basis of his disabilities, in violation of Title II of the ADA and Section 504 by excluding him from participation in and denying the benefits of a public education and the equal opportunity to participate in the benefits provided by Defendant that are afforded to students without disabilities;

2. Find and declare that Defendant has violated 42 U.S.C. § 1983 and infringed on C.G.'s constitutional rights under the Fourteenth

Amendment to the United States Constitution by denying him due process and equal protection;

3. Find and declare that Defendant retaliated against C.G. and his family for advocating on C.G.'s behalf by lawfully filing a Contested Case Petition under the IDEA.

4. Find and declare that Defendant violated the procedural requirement to provide the SRO with information related to C.G.'s disabilities, which resulted in the SRO failing to understand the impact of C.G.'s language and executive functioning deficits and deeming him "uncooperative" and "unresponsive" during the investigation, which he included as a basis for filing two (2) petitions against C.G. in juvenile court.

5. Find and declare that C.G. did not commit the alleged conduct on September 17, 2024, and September 18, 2024, or have the intent to commit the conduct alleged;

6. Find and declare the Defendant's decision to suspend C.G. exceeded its statutory authority, and reverse the Defendant Board's final decision.

7. Find and declare that Defendant's failure to adhere to statutory discipline policies in rendering its final decision was made upon unlawful procedure.

63

8. Find and declare that Defendant violated C.G. and his parents' right to due process, causing them to unnecessarily incur legal fees and suffer emotional distress regarding the unlawful suspensions and the change in the trajectory of C.G.'s academic future if all record of the suspension is not removed from his educational record.

9. Find that Defendant failed to properly train and supervise its subordinates including, but not limited to, Principal Francisco.

10. Find that the Defendant's decision to suspend C.G. was arbitrary, capricious, and an abuse of discretion.

11. Issue a preliminary injunction directing Defendants to cease and desist from discriminating and retaliating against Plaintiff C.G. and directing GCS to allow C.G. to attend his base school immediately

12. Order the Notice of Disciplinary Action and Recommendation for Long-term Suspension and all related documents removed and expunged from C.G.'s educational record;

13. Order GCS to immediately return C.G. to Northwest Guilford Middle School, or another school of his parents' choosing within the GCS, and remove all references to his attendance at SCALE alternative learning program from his educational record;

14. In the alternative, order GCS to place C.G. at a private school

64

appropriate to meet his unique needs and properly address his disabilities where he is not subjected to unfair disciplinary actions that do not align with State and federal law.

15. Order Defendant to hire a qualified consultant(s) to assist making structural changes to GCS' systems, to ensure evidence-based interventions, curriculum, and training are used to respond to students with disabilities accused of violations of the code of student conduct, reduce disparities in disciplinary or punitive measures, and effectively implement Positive Behavior Intervention and Support (PBIS), including trauma informed practices, positive educational and preventive practices and services, and Restorative Practices, as well as sufficient psychological, speech, and other therapeutic services to meet the needs of students with disabilities;

16. Order Defendants to hire, train, coach, coordinate, and evaluate sufficient staff and employees on evidence-based practices and PBIS, including training on the proper application of discipline applied to students with disabilities, including those who have speech and communication-related disabilities;

17. Order Defendants to develop and implement a process to identify students who are disproportionately subject to disciplinary referrals and

65

set benchmarks for identifying students monthly based on appropriate risk criteria;

18. Order Defendants to dedicate sufficient funding to implement the system, provide the needed interventions, and meet the related behavioral and therapeutic needs of students with disabilities to reduce the disproportionate discipline of students with disabilities;

19. Order Defendants to monitor, collect data, and review procedures sufficient to evaluate progress and impact of the system and to respond to improper implementation of discipline against students with disabilities;

20. Order Defendants to designate a qualified responsible GCS employee within the Superintendent's Office, as well as employees in each region, to oversee implementation, compliance, monitoring, and reporting on the system;

21. This Court order Defendant to reimburse Plaintiffs all costs incurred in litigating this matter including, but not limited to, expert witness fees, depositions, and court costs;

22. This Court order Defendant to reimburse Plaintiffs V.G. and E.G.'s lost wages due to Defendant's discriminatory and unlawful removal of C.G. from his educational environment;

23. This Court award Plaintiffs all attorneys' fees pursuant to § 1988 for all fees incurred in litigating claims raised under § 1983;

24. This Court award Plaintiffs all attorneys' fees incurred in litigating claims raised under the fee-shifting provisions of Section 504; and

25. Award Plaintiffs compensatory damages;

26. Award Plaintiffs nominal damages;

27. Award Plaintiffs reasonable attorneys' fees and costs, including any expenses incurred as a result of Defendant's failure to meet the requirements of state and federal law, and state and federal regulations, including but not limited to the costs and expenses incurred for any private evaluations, costs and expenses incurred for C.G. to attend any private therapies, and all expenses incurred in defense of C.G. through the discipline process, which would have ceased had the MDR team followed the procedural requirements of the IDEA, state law, and federal regulations and correctly determined C.G.'s alleged conduct had a direct or substantial relationship to his disabilities, and litigation expenses, as provided by law; and

28. Grant such other and further relief as this Court deems just and proper.

Case 1:24-cv-00992-LPA    Document 1    Filed 11/22/24    Page 67 of 68

Respectfully submitted, this the 22nd day of November, 2024.

/s/ Stacey M. Gahagan
Stacey M. Gahagan
N.C. State Bar No. 44393
3326 Durham Chapel Hill Blvd.,
Suite 210-C
Durham, NC 27707
Telephone: (919) 942-1430
Email: sgahagan@ncgplaw.com